UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ELIZABETH EILERS, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| vs. | )    Case No. 4:10-CV-345 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social | ) |
| Security, | ) |
|     Defendant. | ) |

## **MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I. Procedural History

On June 23, 2006, plaintiff filed an application for childhood insurance benefits under title II of the Social Security Act, 42 U.S.C. § 401 et seq. (Tr. 75-78). Plaintiff claimed disability due to mental retardation, learning disabilities, and anxiety. (Tr. 87). In her application, plaintiff alleged that her disability began on May 25, 1984. (Tr. 38). Plaintiff's application was initially denied on September 28, 2006. Plaintiff requested a hearing before an Administrative Law Judge (ALJ). The hearing was held on August 5, 2008. (Tr. 7). On September 3, 2008, the ALJ determined that plaintiff was not "disabled" prior to attaining twenty-two years of age. (Tr. 38-46). Plaintiff filed a Request for Review on October 28, 2008. (Tr. 32). The Appeals Council denied plaintiff's request for review on February 2, 2010. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

1

## II. Evidence Before the ALJ

### A. Testimony at the Hearing

Plaintiff, her mother, and a vocational expert testified at the hearing. (Tr. 7-31).

At the time of the hearing, plaintiff was twenty-four years old and lived with her mother. (Tr. 10, 23). Plaintiff graduated from high school with a special education diploma and had previous work experience at Target and McDonald's. (Tr. 10-11). She worked at Target for approximately three to six hours a week. (Tr. 15). Her duties included folding clothes and storing items on shelves. (Tr. 13). Although, plaintiff was well received and liked by her manager at Target, she did not have much social interaction with her co-workers. (Tr. 14). Plaintiff testified that she didn't want to talk to customers and she isolated herself from co-workers until she began feeling more comfortable around them. (Tr. 14). After leaving Target, plaintiff worked at McDonald's for approximately two weeks. (Tr. 11). She left this job because she didn't like the work. (Tr. 15). Plaintiff left McDonald's in June 2007 and has not worked anywhere else since then. (Tr. 11). Plaintiff stated that she has not sought employment because she has anxiety and panic attacks and because she has problems with math and English. (Tr. 12, 15).

Plaintiff begins a typical day by attending adult daycare from 10:00 a.m. to 4:00 p.m. on weekdays. (Tr. 25-26). Plaintiff stated that she gets along with others at the adult daycare. (Tr. 17). When she is at home, plaintiff enjoys drawing, reading the newspaper, and watching television. (Tr. 12, 16). Plaintiff goes shopping with her mother, but becomes bothered when the store is crowded. (Tr. 14). She attends church every week, but she experiences anxiety when there are other people sitting

around her. (Tr. 18). Plaintiff performs some household chores, such as cleaning the bathrooms and vacuuming. Her mother reminds her to take her medicine and tells her when she needs to take a shower.

Plaintiff testified that she experiences panic attacks three or four times a week, brought on by her worrying about her health condition and about whether people like her. (Tr. 13). In particular, plaintiff told the ALJ that she worries about whether she is going to feel panicked or whether she will be around a lot of people. (Tr. 13). Plaintiff sees a psychiatrist for her anxiety. (Tr. 16). Plaintiff testified that she takes Effexor,[1] Lamictal, Citalopram, and Trazodone.[2] (Tr. 16).

Plaintiff testified that she was hospitalized twice (in May and in June 2008) for cutting herself due to depression and anxiety. (Tr. 19). Plaintiff began the practice of cutting when she was 18 or 19 years old. (Tr. 21). Her condition became worse after her father died in 2006. (Tr. 21). Plaintiff also testified to having crying spells two or three times a week, prompted by feeling bad about herself and feeling that her mother hates her. (Tr. 20-21).

Plaintiff's mother, Pamela Eilers, testified that she helps plaintiff with cooking and that she provided transportation for plaintiff when needed. (Tr. 23). According to Ms. Eilers, plaintiff was able to bathe herself and did not need to be reminded to

---

[1]Effexor, or Venlafaxine, is indicated for the treatment of major depressive disorder. See Phys. Desk Ref. 3196 (63rd ed. 2009).

[2]Trazodone is a seratonin modulater prescribed for the treatment of depression. It may also be prescribed for the treatment of schizophrenia, anxiety, and alcohol abuse. Lamictal, or Lamotrigene, is used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar disorder. Citalopram is used to treat depression. It is in the class of selective serotonin reuptake inhibitors. http// www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

3

take a shower. (Tr. 23). Ms. Eilers confirmed plaintiff's testimony about her hospitalizations and opined that plaintiff's cutting episodes were prompted by her father's death. (Tr. 26). Ms. Eilers also testified that plaintiff sometimes has panic attacks and crying spells. (Tr. 24-25). She stated that plaintiff "does better" when she takes her medication. (Tr. 26).

Delores Gonzalez testified as a vocational expert. The ALJ posed a hypothetical question to Ms. Gonzalez that asked her to assume an individual of plaintiff's age and education, with no past relevant work and no exertional limitations, and who is limited to performing simple tasks requiring no more than occasional contact with others. In response, Ms. Gonzalez opined that such an individual could perform light or sedentary, unskilled work. When the hypothetical was modified to include the need for extra assistance or extra supervision in setting and reaching goals, Ms. Gonzalez testified that there would be no jobs available for such an individual in the open market. (Tr. 28-29).

### B. School Records and Vocational Records

In January 1990, at the age of six, plaintiff was evaluated by the Cardinal Glennon Children's Hospital. (Tr. 160). The results of the evaluation indicated that plaintiff demonstrated a disturbance of language, characterized by impaired verbal communications. (Tr. 142). It was recommended that plaintiff participate in language therapy. (Tr. 146).

Three months later, plaintiff was administered the Wechsler Preschool and Primary Scale of Intelligence by the School District of the City of St. Charles. (Tr. 160). The results indicated that plaintiff had a full scale IQ of 73, which suggested that she had borderline ability in cognitive functioning, delayed visual motor integration

4

skills, and a reading age of 3.7 months. (Tr. 160). A behavioral evaluation conducted by a classroom teacher raised concerns that plaintiff was suffering from learning problems. (Tr. 160). Also, an inventory of basic skills and a language skills evaluation suggested that plaintiff had problems in visual and language skills. (Tr. 160). Plaintiff showed weakness in visual memory, fine and gross motor skills, and in the ability to comprehend and respond to language. (Tr. 160). Based on these results, current teacher reports, and daily performance, the district's staffing committee determined that plaintiff did not meet the criteria to be diagnosed as handicapped. (Tr. 142). Plaintiff's results, however, did indicate that she was at high risk for needing special programming.

In June of 1990, plaintiff's condition was re-evaluated by the school district. (Tr. 142). It was concluded that plaintiff had a slow rate of learning. (Tr. 147). Test results from Vineland Adaptative Behavior Interview Scale indicated that plaintiff had low adaptative scores. (Tr. 161). Also, the school district noted that plaintiff's communication, daily living skills, and motor skills fell below the level of functioning. (Tr. 161). After reviewing teacher reports regarding plaintiff's low adaptative scores, poor motor skills, and her language difficulties, the school district concluded that the plaintiff did meet the district's eligibility criteria in order to be diagnosed as educable mentally retarded. (Tr. 142).

Plaintiff was evaluated again in 1993. The school district administered the Weschler Intelligence Scale for Children. (Tr. 141). Results indicated that plaintiff had a low average ability with a Verbal IQ of 82, performance IQ of 87, and Full Scale IQ of 84. (Tr. 141). The scores in the verbal areas revealed weakness in information, arithmetic, vocabulary, comprehension, and digit span. (Tr. 150). Performance scores

indicated normative weakness in block design, object assembly, and perceptual organization. Overall, plaintiff's math scores were low. Her math composite score fell in the lower range at a 1.1 grade level. (Tr. 151). Her math achievement score fell in the well below average range at the 1.3 grade level and math calculation fell at the 1.0 grade placement. (Tr. 151). Plaintiff's reading scores were slightly better. Her composite score fell in the average range at the 3.0 grade, and her reading decoding level fell in the average range at the 3.8 grade level. (Tr. 151). Plaintiff's spelling also fell in the average range at the 2.9 grade level. (Tr. 151).

Classroom observations conducted by the special education teacher revealed that plaintiff was on task seventy percent of the time in a thirty-minute class period. (Tr. 153). Plaintiff's work habits, however, were noted as inadequate due to low incomprehension and inability to apply concepts. (Tr. 153). Socially, plaintiff did not get along with her peers and was described as a "loner." (Tr. 153). However, academically plaintiff showed growth. (Tr. 153). Her grades for the third-grade quarter reflected the following: a C- in Reading, B- in Math, B in Spelling, B- in Handwriting, and a B+ in the Arts. (Tr. 153). Based on the formal assessments, teacher reports, and plaintiff's daily performance, the school district concluded that plaintiff did not meet the criteria to sustain a diagnosis of educable mentally retarded. (Tr. 154). Instead, the staffing committee diagnosed plaintiff as learning disabled and language impaired. (Tr. 154).

Plaintiff was reevaluated again in 1993. (Tr. 141-144). The results of the evaluation did not differ dramatically from plaintiff's previous evaluation. (Tr. 143). The evaluation indicated that plaintiff had mainstreamed into the third grade for reading and science. (Tr. 143). Similarly to her other evaluations, plaintiff's math and

writing skills were below average. (Tr. 143). Socially, plaintiff appeared to be making progress by interacting more appropriately with her peers. (Tr. 143). Therefore, the school district concluded that plaintiff continued to meet the criteria as learning disabled in the areas of math calculation, math application, reading comprehension, and written expression. (Tr. 143-144).

Plaintiff was evaluated frequently throughout her middle school and high school years. (Tr. 166-349). In an evaluation conducted during plaintiff's ninth grade school year, it was determined that plaintiff possessed average skills in cognitive abilities, adaptative behavior and social skills. (Tr. 166-169). As to her social interactions, plaintiff was able to establish and maintain peer relationships. (Tr. 166). Plaintiff's learning disability, however, continued to affect her performance in written expression, math calculation, math reasoning and reading comprehension. (Tr. 167-168).

Plaintiff's evaluations and learning disability diagnoses did not change significantly until 2008. In 2008, plaintiff was given a Weschsler Adult Intelligence Scale- Third Edition (WAIS-III). (Tr. 499). The test results indicated that plaintiff had a full scale IQ of 65, verbal IQ of 71, and performance IQ of 64. (Tr. 499). Plaintiff's functioning level was in the mild mentally deficient classification. (Tr. 499). Based on these results, plaintiff was diagnosed as functioning in the mild mentally deficient range of intelligence. (Tr. 499).

### C. Medical Records

Plaintiff began treatment with Martin Walsh, M.D., her primary care physician, in June 7, 2002. Dr. Walsh's medical records indicate that plaintiff was suffering from depression and self-mutilation. (Tr. 432). His records also indicate that on July 14,

7

2005 plaintiff was suffering from depression, stress, anxiety, panic attacks, and obsessive-compulsive disorder (OCD). (Tr. 425). Dr. Walsh prescribed Paxil and referred plaintiff to a psychiatrist, Dr. Illvicky.[3] (Tr.425, 432).

In May 25, 2006, plaintiff was treated at Barnes Jewish emergency room for self-mutilation. (Tr. 412). The medical record indicates that, prior to hospitalization, plaintiff found her father unconscious in their home and later learned that he had died. (Tr. 412). Plaintiff was given Xanax and was discharged on that same day. (Tr. 413).

In January 2007, plaintiff visited Dr. Walsh again. During that visit Dr. Walsh completed a Residual Functional Capacity Form. (Tr. 623-26). On the form, Dr. Walsh wrote that due to her anxiety disorder, plaintiff had either poor or no ability to remember work-like procedures, accept instructions are respond appropriately to supervisors, interact with the general public, maintain social appropriate behavior and adhere to basic standards of neatness and cleanliness, deal with normal work stress, set realistic goals, and make plans independently of others. (Tr. 622-626).

On January 19, 2007, plaintiff began visiting Richard Anderson, M.D., a psychiatrist. Dr. Anderson stated that plaintiff appeared to be struggling with depression, grief, post- traumatic, mood swings, probable borderline intellect, and has a limited ability to care for self. (Tr. 473). In a letter written to Dr. Walsh, Dr. Anderson also noted that plaintiff's problems appeared to be aggravated by her father's death. (Tr. 469). Shortly after her father's death, plaintiff reported frequent crying, sleeping problems, and mood swings. (Tr. 469). Dr. Anderson also stated that

---

[3]Paxil is a psychotropic drug indicated for the treatment of major depressive disorder, obsessive-compulsive disorder, panic disorder, social anxiety disorder, generalized anxiety disorder, and post-traumatic stress disorder. See Phys. Desk. Ref. 1501-03 (60th ed. 2006).

plaintiff is shy around other people. (Tr. 469). She has several friends and does not talk to them on a regular basis. (Tr. 469). Dr. Anderson prescribed her Celexa, Trazodone, and Xanax.[4]

In 2008, plaintiff went to the emergency room again. (Tr. 510). She was hospitalized for suicidal ideation. Plaintiff had cut her body, stomach, shoulders, and legs. (Tr. 510). Medical records indicate that plaintiff was hospitalized on the three-year anniversary of her father's death. (Tr. 510). At the time of her hospitalization, plaintiff was feeling irritable, having angry outbursts, hitting walls, and had thoughts of cutting her legs and shoulders. (Tr. 510).

In 2008, plaintiff was also evaluated by Vincent Stock, M.A., a licensed psychologist. (Tr. 498). Mr. Stock found that plaintiff appeared to be disoriented at times and heavily dependent on her mother, needing her mother seventy-percent of the time. (Tr. 498). Mr. Stock also concluded that plaintiff memory was sightly impaired in that she often forgets names, addresses, and her medications. (Tr. 498). Mr. Stock's medical records indicate that plaintiff had poor social and work-related skills. (Tr. 498). Plaintiff displayed difficulty in interacting with the general public, adhering to basic standards of cleaniness, understanding detailed instructions, dealing with normal work stress and getting along with other co-workers. (Tr. 504). Based on his observations and after administering an intelligence test to plaintiff, Mr. Stock

---

[4]Xanax is indicated for the treatment of panic disorder. See Phys. Desk Ref. 2655-56 (60th ed. 2006).

diagnosed plaintiff with generalized anxiety disorder and dysthymic disorder.[5] (Tr. 503).

### III. The ALJ's Decision

The ALJ made the following findings:

1. The claimant attained the age of 22 on May 24, 2006, the day before her 22nd birthday. 20 CFR 404.102.

2. The claimant has not engaged in substantial gainful activity since May 25, 1984, the alleged onset date. 20 CFR 404.1520(b) and 404.1571

3. Prior to attaining 22, the claimant had the "severe" impairments of depression anxiety and a learning disability. 20 CFR 404.1520(c).

4. Prior to attaining age 22, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404.1520(d), 404.1525 and 404.1526.

5. After careful consideration of the entire record, I find that, prior to attaining the age 22, the claimant had the residual functional capacity to perform a full range of work at all exertional levels. In addition, the claimant was limited to performing simple tasks only which required no more than occasional contact with the general public and co-workers.

6. The claimant has no past relevant work. 20 CFR 404.1565.

7. The claimant is a younger individual age 18-44. 20CFR 404.1563.

8. The claimant has a limited special education high school diploma and is able to communicate in English.

9. Transferability of job skills is not an issue because the claimant does not have past relevant work.

10. Prior to attaining age 22, considering the claimant's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

---

[5] Dysthmic Disorder is a chronic type of depression in which a person's moods are regularly low. It is considered less severe than major depressive disorder. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001916/.

11. The claimant was not under disability as defined in the Social Security Act, at any time prior to May 24, 2006, the date she attained 22. 20 CFR 404.350(a)(5) and 404.1520(g).

## IV. Discussion

To be eligible for childhood disability insurance benefits, a plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). Furthermore, under the Social Security Act, one can only receive payment of childhood disability benefits if the claimant is 18 years old or older and had a disability before attaining the age of twenty-two. 20 C.F.R. 404.350(a)(5).

To determine whether a claimant is disabled, the Commissioner employs a five step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv., 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, she is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability

to do basic work activities. If the claimant's impairment is not severe, she is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, she is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform her past relevant work. If the claimant can, she is not disabled. Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether she is capable of performing any other work in the national economy. If the claimant is not, she is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A. Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. the ALJ's credibility findings;
2. the plaintiff's vocational factors;
3. the medical evidence;

> 4. the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;
>
> 5. third-party corroboration of the plaintiff's impairments; and
>
> 6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

### B. Plaintiff's Allegations of Error

Plaintiff's administrative appeal raises the following allegations of error: (1) the ALJ did not comply with 20 C.F.R. § 404.1527 by failing to accord adequate weight to the opinions of Dr. Walsh and Dr. Anderson; (2) the ALJ committed reversible error in failing to re-contact the claimant's treating medical providers as required by 20 C.F.R. § 404.1512(e); (3) the ALJ committed reversible error in not finding that the claimant's mental retardation meets the requirements of Listing 12.05(C); (4) the ALJ committed reversible error in failing to consider whether the claimant's mental retardation was medically equivalent to Listing 12.05; and (5) the ALJ should have considered all available disability claims and/or plaintiff's case should be remanded for consideration of an SSI claim due to the conduct of the SSA.

The Court first turns to plaintiff's argument that the ALJ failed to accord adequate weight to the opinions of Dr. Walsh and Dr. Anderson. On January 10, 2007, Dr. Walsh completed a Residual Functional Capacity form for the plaintiff. (Tr. 624-626). On the form, Dr. Walsh indicated that plaintiff suffered from persistent anxiety, poor insight, recurrent panic attacks, and an inability to perform simple calculations. (Tr. 624-626). Dr. Walsh also indicated that plaintiff's symptoms frequently interfered with her attention and concentration. (Tr. 626). It was also noted that plaintiff had poor and or no ability to remember work-like procedures. (Tr. 626). In 2007, plaintiff was seen for the first time by Dr. Anderson. Dr. Anderson stated that plaintiff was experiencing depression, anxiety, panic attacks, grief, social isolation, hopelessness, and feelings of worthiness. (Tr. 378).

The ALJ discredited the opinions of Dr. Walsh and Dr. Anderson. According to the ALJ, Dr. Walsh's opinions in the RFC form were not supported by the doctor's treatment notes for the relevant period and were inconsistent with the plaintiff's school records. (Tr. 42). With regard to Dr. Anderson's opinions, the ALJ concluded that there was no mention of mental retardation in the doctor's reports and, therefore, the evidence provided by Dr. Anderson did not support a finding of mental retardation.

The amount of weight to be given to a medical opinion is governed by several factors, including: whether the source of the opinion has treated the claimant and, if so, the length of the treatment relationship, the frequency of treatment, whether the source supports the proffered opinion with relevant medical evidence, whether the opinion is consistent with the medical record as a whole, and whether the source is a specialist. 20 C.F.R. § 404.1527(d).

The Court finds that the ALJ did not err in discrediting the opinions of Dr. Walsh and Dr. Anderson. Even if the doctors' opinions were consistent with the record, the evidence was not obtained in the relevant time period. In order to obtain child insurance benefits, a plaintiff must have been disabled prior to his or her twenty-second birthday. Dr. Walsh and Dr. Anderson's opinions were obtained after May 24, 2006, plaintiff's twenty-second birthday, and therefore, have no bearing on whether plaintiff is entitled to child insurance benefits.

Plaintiff next argues that the ALJ erred in finding that she did not meet the requirements for mental retardation in Listing 12.05(C). In order to meet Listing 12.05(C) the plaintiff must establish: (1) mental retardation; (2) valid verbal performance or full scale IQ score of 60 through 70; and (3) a physical or other mental impairment that is severe within the meaning of 20 C.F.R.404.1520(c).[6] In order to establish disability under the adult mental retardation listing, a claimant must prove onset before age twenty-two. See Maresh v. Barnhart, 438 F.3d 897 (8th Cir. 2006).

The ALJ found that there was insufficient evidence to corroborate plaintiff's allegation of mental retardation. (Tr. 42). The Court finds that the ALJ's determination is supported by substantial evidence. In 1993, plaintiff took the Wechsler Intelligence and obtained a verbal IQ of 82, a performance IQ of 87, and a full scale IQ of 84. (Tr. 141). These scores are ten points higher than what is required under Listing 12.05(C). In regards to plaintiff's functioning abilities, the record indicates that plaintiff was functioning in the low average to borderline range. (Tr. 141). Functioning in a

---

[6]Listing 12.05 provides:
Mental Retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested.

borderline range does not indicate mental retardation. Furthermore, from 1993 to 2008, school records only indicate that plaintiff had a learning disability in written expression, math calculation, math reasoning, and reading comprehension. (Tr. 143) Plaintiff was not diagnosed as mentally retarded. Also, school records from plaintiff's middle and high schools years indicate that plaintiff's social, writing and math skills were improving. (Tr. 166-169). Similarly, plaintiff's medical records do not support a finding of mental retardation. In December 2002, Dr. Walsh only diagnosed plaintiff with anxiety, not with mental retardation

The only evidence indicating that plaintiff suffered from mental retardation was derived after plaintiff became twenty-two. In 2008, psychologist Vincent Stock diagnosed plaintiff with metal retardation after administering her the Wechsler Adult Intelligence Scale, in which plaintiff obtained a full IQ scale in the 60's and a verbal IQ of 71. (Tr. 499) This evidence, however, was properly discredited by the ALJ. Plaintiff's test results from 2008 post-dates May 24, 2006, the relevant time period for child insurance benefits.

The plaintiff also claims that the ALJ erred in failing to re-contact her treating physicians as required by 20 C.F.R. §404.1512(e).[7] An ALJ is "not required to seek

---

[7]20 C.F.R. § 404.1512 provides: When the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions:

(1) recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques. We may do this by requesting copies of your medical source's records, a new report, or a more detailed

additional clarifying statements from a treating physician unless a crucial issue is undeveloped." Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). Here, the ALJ did not indicate that a crucial issue was left untouched or undeveloped by the physicians' notes. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Thus, the Court finds that the ALJ did not have a duty to re-contact plaintiff's treating physicians.

Plaintiff also requests that this case be remanded to the SSA. After filing this appeal, plaintiff filed a new application for disability benefits. An ALJ issued a favorable decision, finding that the plaintiff was disabled as of November 12, 2008. Plaintiff seeks reversal of the ALJ's decision in this case, in order to allow the SSA to reconsider her claim of disability prior to November 12, 2009. Plaintiff attaches her new application and the ALJ's favorable decision to her reply brief.

Although new evidence may be a basis for remand under 42. U.S.C. § 405(g), such evidence must be material and there must be good cause for failure to incorporate the evidence into the record before the Commissioner. Jones v. Callahan, 122 F.3d 1148, 1154 (8th Cir. 1993)(citing Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991)). In order for evidence to be material, it must be probative of the plaintiff's condition for the time period for which benefits were denied. Id. Here, the new evidence is not probative of plaintiff's condition prior to May 24, 2006. The ALJ's

---

report from your medical source, including your treating source, or by telephoning your medical source. In every instance where medical evidence is obtained over the telephone, the telephone report will be sent to the source for review, signature and return.

(2) We may not seek additional evidence or clarification from a medical source when we know from past experience that the source either cannot or will not provide the necessary findings.

decision in plaintiff's second application for benefits primarily relied on evidence that was obtained after plaintiff turned twenty-two. The ALJ in that case considered plaintiff's hospitalizations in 2008 and WAIS-III test results administered in 2008. In fact, the ALJ stated that plaintiff's symptoms increased and were complicated by the death of her father in 2006. Because the new evidence was obtained after May 24, 2006, it is not relevant to the determination presently before the Court. Therefore, this case will not be remanded on the basis of plaintiff's new evidence.

## V. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, the plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by the plaintiff in her complaint [#1] is **denied**.

A separate judgment in accordance with this order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 28th day of March, 2011.